## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEAL A. MITCHELL, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>    v.<br><br>TARO PHARMACEUTICAL INDUSTRIES LTD., DILIP SHANGHVI, ABHAY GANDHI, UDAY BALDOTA, LINDA BENSHOSHAN, JAMES KEDROWSKI, ODED SARIG, ROBERT STEIN, SUDHIR VALIA and SUN PHARMACEUTICAL INDUSTRIES LTD.,<br><br>            Defendants. | Case No. 7:24-6818<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**1. VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9**<br><br>**2. VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |

Neal A. Mitchell ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of himself and the other former shareholders of Taro Pharmaceutical Industries Ltd. ("Taro" or the "Company"), except Defendants (defined below) and their affiliates, against Taro, the members of Taro's board of directors (the "Board" or the "Individual Defendants"), and Sun Pharmaceutical Industries Ltd. ("Sun Pharma") for their violations of Sections 13(e), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78m(e), 78n(a), and 78t(a), and SEC Rules 13e-3 and 14a-9, 17 C.F.R. §§ 240.13e-3 and 240.14a-9, in connection with the acquisition (the

"Transaction") of Taro by Sun Pharma.  Sun Pharma and its affiliates controlled 85.7% of Taro's total voting power.

2.     On January 17, 2024, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Sun Pharma, pursuant to which, Taro shareholders received $43.00 in cash for each ordinary share they owned (the "Merger Consideration").

3.     On, April 15, 2024, the Board authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act and setting a vote (the "Shareholder Vote") for a special meeting of shareholders on May 22, 2024 (the "Special Meeting").

4.     Because the Israel Companies Law, 5799-1999 (the "Israel Companies Law") prohibits a controlling shareholder of a publicly traded company from using its voting power to unilaterally acquire the publicly traded company in a statutory merger, the Merger Agreement included a "majority of the minority" approval condition (the "Majority of the Minority Vote Condition"). This Majority of the Minority Vote Condition required that the Merger Agreement be approved by a vote of the majority of the shares that were voted that were not controlled by Sun Pharma unless less than 2% of Taro's total voting power was voted against the Transaction. i.e., 98% or more of Taro's total voting power voted for the Transaction.  Because Sun Pharma and its affiliates controlled 85.7% of Taro's total voting power, approximately 15% of the disinterested shares would need to be voted against the Transaction to trigger the Majority of the Minority Condition.

5.     While Defendants touted the fairness of the Merger Consideration to the Company's stockholders, they failed to disclose material information in the Proxy that was necessary for

stockholders to properly assess the fairness of the Transaction, thereby rendering certain statements in the Proxy incomplete and misleading.

6.    Specifically, the Proxy contained three types of materially incomplete and misleading information and/or omissions: , (i) information concerning the methodology and key assumptions underlying the fairness opinion and valuation analyses that were prepared by Taro's financial advisor, BofA Securities, Inc.'s ("BofA Securities"),  (ii) information about the status of pending litigation against Taro, including the fact that Taro had just reached a settlement in principle with respect to claims under federal securities laws predicated on the impact of certain civil antitrust matters, and (iii) information about the respective recommendations of proxy advisory firms Institutional Shareholder Services ("ISS") and Glass Lewis & Co. ("Glass Lewis").

7.    *First*, the Proxy materially misrepresented the assumptions underlying BofA Securities' financial analyses and fairness opinion, particularly with respect to whether and how BofA Securities accounted for the potential impact of ongoing multi-jurisdiction civil antitrust matters (the "Pending Litigation").  The Proxy indicates that the Taro Board had previously approved a litigation loss contingency amount of $141 million (the "Litigation Loss Contingency") for settlement loss contingencies relating to global resolutions.

8.    The Proxy actively misled investors. It stated that BofA Securities calculated Taro's implied equity values by adding to the enterprise values it had calculated "an estimate of the net cash of the Company of $1,295 million."  In fact, BofA Securities added net cash of $1,155 million because it subtracted the $141 million Litigation Loss Contingency from Taro's existing net cash balance of $1,295 million.   The Proxy also concealed the facts that, when BofA Securities presented its "sensitivity analysis" to Taro, BofA Securities actually accounted for an *additional* $141 million in litigation loss contingencies, *i.e.,* a $282 million loss contingency, an amount that

Sun Pharma had advocated for but which Taro's Special Committee had expressly rejected, thereby creating drastic undervaluation of Taro and misleading Taro's public stockholders as to the true value of Taro.

9.    *Second*, the Proxy stated that, on December 7, 2023, Sun Pharma had advocated for an increase in the $141 million Litigation Loss Contingency on the grounds that the total cost to resolve pending litigation would "by definition be higher than $141 million" because the Board had approved the $141 million Litigation Loss Contingency based on settlement offers that Taro had made but all of those settlement offers had been rejected.  However, the Proxy concealed the fact that Taro had already agreed to a settlement in principle on September 26, 2023 to resolve securities claims that were predicated on the antitrust violations.[1]  Reiterating Sun Pharma's position that the $141 million litigation loss contingency underestimated the likely loss from pending litigation because the $141 million amount "was derived from an accounting calculation that involved aggregating, and extrapolating from, the settlement offers that Taro had made, all of which had been rejected" without disclosing the impact of the *Speakes* Settlement was a half-truth at best.

10.    *Third*, on May 8, 2024, shortly before the Shareholder Vote, Taro amended its Schedule 13E-3 filing touting the opinions of two proxy advisory firms, Institutional Shareholder Services ("ISS") and Glass Lewis & Co. ("Glass Lewis"), which had "recommended" that Taro's shareholders vote for the Transaction.  Taro touted these recommendations as opinions materially related to the Transaction without making the written opinions and reports available to shareholders, summarizing or describing ISS and Glass Lewis' methodologies, procedures, and

---

[1] *See Speakes v. Taro*, No. 16-cv-8318, Dkt. No. 101-1 (Stipulation and Agreement of Settlement), ¶ H, *filed* April 15, 2024 (S.D.N.Y.) (the "*Speakes* Settlement").

assumptions, or disclosing whether Taro had paid ISS and Glass Lewis for these recommendations.[2] .

11.    Although Taro reported on June 24, 2024 that the Shareholder Vote had passed, Taro failed to actually report the voting results notwithstanding the structure of the Shareholder Vote and the fact there were significant open questions as to whether Taro satisfied the Majority of the Minority Vote condition in light of the opposition that the Transaction faced from Taro's second-largest shareholder, Krensavage Asset Maangement LLC ("Krensavage").[3]  In fact, Taro refused to provide these voting results even when Krensavage specifically requested them.

12.    For these reasons as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

---

[2] *See* 17 C.F.R. §§ 229.1015(b) and (c), 240.13e-3(d), 240.13e-100, 17 C.F.R. 229.1015(b) and (c).

[3] *See* 74 Fed. Reg. 68334, 68350 ("companies are required to file the preliminary voting results within four business days after the final voting results are known"); U.S. SEC, *Compliance and Disclosure Interpretations Exchange Act Form 8-K*, Question 121A.02 (noting that Form 8-K Item 5.07(b) requires the issuer "to report the number of shareholder votes cast for, against or withheld" and that "applies with respect to any matter submitted to a vote of security holders, through the solicitation of proxies or otherwise").

Although Taro reports the results of its operations on Form 6-K because it is a foreign issuer, this is undoubtedly material information that should have been disclosed in the final amendment to the Schedule 13E-3 reporting "the results of the Rule 13E-3 transaction."  17 C.F.R. §§ 240.13e-3, 240.13e-100 Item 15, 229.1011(c).

14. Personal jurisdiction exists over each Defendant either because each Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Taro's principal executive office for operations in the United States is located in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## **PARTIES**

16. Plaintiff was, and had been at all relevant times, the owner of Taro common stock and held such stock from prior to the wrongs complained of herein until his shares were cancelled pursuant to consummation of the Merger Agreement on June 24, 2024. Information regarding his stock holdings appears in the attached certification.

17. Defendant Taro is an Israeli company with its principal U.S. executive offices located at 3 Skyline Drive, Hawthorne, NY 10532.  Taro is a pharmaceutical company now wholly owned by Sun Pharma.  Before the Transaction, Taro's common stock traded on the New York Stock Exchange ("NYSE") under the symbol "TARO" until June 24, 2024.

18.     Individual Defendant Dilip Shanghvi was at all relevant times a director of Taro and the Chairman of the Taro Board, and was also the Managing Director and controlling shareholder of Sun Pharma.

19.     Individual Defendant Abhay Gandhi was at all relevant times a director of Taro and the Vice Chairman of the Board. Individual Defendant

20.     Individual Defendant Uday Baldota was at all relevant times a director and Chief Executive Officer of Taro.

21.     Individual Defendant Linda Benshoshan was at all relevant times a director of Taro.

22.     Individual Defendant Robert Stein was at all relevant times a director of Taro.

23.     Individual Defendant Oded Sarig was at all relevant times a director of Taro.

24.     Individual Defendant James Kedrowski was at all relevant times a director of Taro.

25.     Individual Defendant R. Sudhir Valia was at all relevant times a director of Taro and a director of Sun Pharma.

26.     Defendant Sun Pharma is a company organized under the laws of India. Sun Pharma and its affiliates controlled 85.7% of Taro's total voting power before the Merger Transaction. It now owns 100% of the shares of Taro. The defendants identified in paragraphs 18-27 are collectively referred to as the "Defendants".

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Taro common stock who are being and will be harmed by Defendants' actions described below (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

28.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable.  As of March 23, 2023, Taro had approximately 7.8 million ordinary shares outstanding that were not held or controlled by Sun Pharma.

(b)    The holders of these shares are believed to be geographically dispersed throughout the United States and elsewhere;

(c)    There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

i.    Whether Defendants have violated Sections 13(e) or 14(a) of the Exchange act and Rules 13e-3 and 14a-9 promulgated thereunder;

ii.    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii.    Whether Plaintiff and the other members of the Class suffered injury when they voted on the Transaction.

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### I.    Background and the Transaction

29.    Taro was organized as an Israeli company. and is a pharmaceutical company. Taro's common stock traded on the NYSE under the symbol "TARO."

30.    Sun Pharma is the largest pharmaceutical company in India and is a leading generic drug company in the U.S. Sun Pharma was the majority owner of Taro.

31.    During the period leading up to the Transaction, Sun Pharma publicly expressed interest in acquiring Taro but was met with significant opposition from some of Taro's largest minority shareholders.  For example, on July 19, 2023, Krensavage issued a press release entitled *Krensavage Asset Management Opposes Sun's Lowball Bid for Taro* to publicly announce that it opposed Sun Pharma's May 26, 2023 proposal to purchase Taro for $38 per share on the grounds that the $38 per share offer implied a 17% discount to Taro's tangible assets and that Taro shareholders would receive more than $45 per share in a liquidation without even giving credit to Taro's value as a generic creams and ointments maker that had generated $2.4 billion of cash during the 10 years ended March 31, 2023.

32.    Nonetheless, on January 17, 2024, Taro and Sun Pharma issued a joint press release to announce the Transaction stating as follows:

**Taro Announces Merger Agreement with Sun Pharma**

**Agreed Price of US$43.00 per Share to Deliver 48% Premium to Unaffected
Price on May 25, 2023**

**Mumbai, India and New York, USA January 17, 2024** – Sun Pharmaceutical Industries Limited (Reuters: SUN.BO, Bloomberg: SUNP IN, NSE: SUNPHARMA, BSE: 524715) (together with its subsidiaries and/or associates referred as "Sun Pharma") and Taro Pharmaceutical Industries Ltd. (NYSE: TARO) ("Taro" or the "Company") today announced that they have entered into a definitive merger agreement in which Sun Pharma, Taro's controlling shareholder, has agreed to acquire all of the outstanding ordinary shares of Taro other than the shares already held by Sun Pharma or its affiliates for US$43.00 per share in cash without interest.

Dilip Shanghvi, Managing Director of Sun Pharma, said, "Over the years, with Sun Pharma's strategic interventions, Taro has remained a key player in the generic dermatology market in a challenging environment. Post completion of the merger, the combined entity will firmly move forward, leveraging its global strengths and capabilities to better serve the needs of patients and healthcare professionals."

Uday Baldota, Chief Executive Officer of Taro, said, "Taro is committed to delivering high quality products to our patients and customers around the world. This merger will further enable us compete effectively in our products and markets."

The US$43.00 per share purchase price represents a 48% premium over the closing price of US$28.97 per share on May 25, 2023, the last trading day before Sun Pharma first submitted its non-binding proposal to Taro, and a premium of 58% to the volume-weighted average price of the shares during the 60 days prior to and including May 25, 2023. The purchase price also represents a 13% increase over the initial proposed purchase price of US$38.00 per share as proposed on May 26, 2023.

The merger agreement was unanimously recommended by the Special Committee, which was formed by Taro's Board of Directors to consider Sun Pharma's proposal. Following a comprehensive evaluation of the proposal with assistance from independent financial and legal advisors, the Special Committee determined that the merger agreement and the per share merger consideration are fair and in the best interests of Taro and its minority shareholders.

Upon receiving the unanimous recommendation of the Special Committee, and following unanimous approval by Taro's Audit Committee, Taro's Board and the Board of Directors of Sun Pharma unanimously approved the definitive merger agreement.

The merger is subject to various closing conditions. These include, among other conditions, the approval of the merger by the affirmative vote of shareholders representing at least 75% of the voting power of the Company's shares present and voting in person or by proxy at a meeting of the Company's shareholders, including at least a majority of the voting power of such shares held by holders other than

Sun Pharma and its affiliates or any other holders having a personal interest (under the Israeli Companies Law) in the merger and voting thereon.

Sun Pharma has agreed to vote its shares in favor of the merger, and has indicated that it is not willing to sell its shares to a third party or support any alternative transaction to the merger.

Upon completion of the merger, currently expected to close in the first half of 2024, Taro will become a privately held company and its shares will no longer be listed on the NYSE.

The Special Committee retained BofA Securities, Inc. as its financial advisor, Goldfarb Gross Seligman & Co. as its Israeli counsel and Skadden, Arps, Slate, Meagher & Flom LLP as its U.S. legal counsel, to assist it in its mandate. Herzog, Fox & Neeman is acting as Israeli legal counsel to Sun Pharma and Davis Polk & Wardwell LLP is acting as U.S. legal counsel to Sun Pharma. Meitar is acting as Israeli legal counsel to Taro and Shearman & Sterling LLP is acting as U.S. legal counsel to Taro.

## II.    The Proxy Was Materially Incomplete and Misleading

33.    On April 15, 2024, Taro filed the Proxy with the SEC in connection with the Transaction.  The Proxy solicited the Company's shareholders to vote in favor of the Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.   However, the Proxy misrepresents and/or omits material information that was necessary for the Company's shareholders to cast an informed vote regarding the Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

34.    Specifically, the Proxy contained three types of materially incomplete and misleading information: (i) information concerning the methodology and key assumptions underlying the fairness opinion and valuation analyses that were prepared by Taro's financial advisors, BofA Securities, (ii) information about the status of pending litigation against Taro, including the fact that Taro had just reached a settlement in principle with respect to claims under the federal securities laws predicated on the impact of certain civil antitrust matters, and (iii) information

about ISS and Glass Lewis' reports and opinions recommending that Taro's shareholders vote to approve the Transaction.

**1.    The Proxy Concealed and Misrepresented Information about BofA Securities' Fairness Opinion**

35.    The Proxy contains materially incomplete and misleading information concerning BofA Securities' methodology and key assumptions in describing the valuation analyses that BofA Securities performed.

36.    Under 17 C.F.R. § 240.14a-3, any proxy solicitation must contain the information specified in Schedule 14A (17 C.F.R. § 240.14a-101).

37.    Item 14(b)(6) of 17 C.F.R. § 240.14a-101 requires that proxy solicitations with respect to merger transactions must include, among other things, the information required by Item 1015(b) of Regulation M-A (17 C.F.R. § 229.1015).

38.    17 C.F.R. §§ 240.13e-3 and 13e-100 also required that Taro's Schedule 13E-3 include all of the information required by Item 1015 of regulation M-A (17 C.F.R. § 229.1015).

39.    17 C.F.R. § 229.1015 states:

> § 229.1015 (Item 1015) Reports, opinions, appraisals and negotiations.
>
> …
>
> (b)    Preparer and summary of the report, opinion or appraisal. For each report, opinion or appraisal described in response to … Item 14(b)(6) of Schedule 14A (§ 240.14a-101 of this chapter) concerning the terms of the transaction:
>
> > (1)    Identify the outside party and/or unaffiliated representative;
> >
> > (2)    Briefly describe the qualifications of the outside party and/or unaffiliated representative;

(3)     Describe the method of selection of the outside party and/or unaffiliated representative;

(4)     Describe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between:

    (i)     The outside party, its affiliates, and/or unaffiliated representative; and

    (ii)    The subject company or its affiliates;

(5)     If the report, opinion or appraisal relates to the fairness of the consideration, state whether the subject company or affiliate determined the amount of consideration to be paid or whether the outside party recommended the amount of consideration to be paid; and

(6)     Furnish a summary concerning the negotiation, report, opinion or appraisal. The summary must include, but need not be limited to, the procedures followed; the findings and recommendations; the bases for and methods of arriving at such findings and recommendations; instructions received from the subject company or affiliate; and any limitation imposed by the subject company or affiliate on the scope of the investigation.

40.    Although the Proxy indicated that BofA Securities opined that the Merger Consideration was fair, it did not clearly state whether BofA Securities "recommended the amount of consideration to be paid." Instead, the Proxy contained an ambiguous statement that "[t]he type and amount of consideration payable in the merger was determined through negotiations between the Special Committee and Sun Pharma, rather than by any financial advisor, and was approved by the Special Committee, the Audit Committee and the Board."

41.    The fact that the "amount of consideration payable in the merger was determined through negotiations between the Special Committee and Sun Pharma" is consistent with the

possibility that BofA Securities "recommended the amount of consideration to be paid." For example, while the negotiations between Taro's Special Committee and Sun Pharma ultimately **determined** the amount of consideration, BofA Securities may have **recommended** to Taro's Special Committee a "target" price that they should attempt to obtain through its negotiations.

42. Moreover, theProxy also affirmatively misrepresented the methodology, assumptions, and procedures that BofA Securities employed in performing the financial analyses that underpinned its fairness opinion.

43. Specifically, the Proxy failed to disclose the fact that BofA Securities' valuation ranges already accounted for the $141 million Litigation Loss Contingency that the Taro Board had approved, and misleadingly suggested to Taro's public stockholders that applying the $141 million Litigation Loss Contingency would result in a valuation range that was approximately $3.75 per share less than the ranges in the Proxy Statement.

44. The Proxy indicates that BofA Securities performed a discounted cash flow analysis, which is a fundamental valuation analysis that estimates a company's intrinsic value based on the cash flows that the company is projected to produce, and describes BofA Securities' discounted cash flow analysis as follows:

*Discounted Cash Flow Analysis*

BofA Securities performed a discounted cash flow analysis of the Company to calculate a range of implied present values per Taro ordinary share utilizing estimates of the standalone, unlevered, after-tax free cash flows the Company was expected to generate over the period from September 30, 2023 through Taro's fiscal year 2034 based on the Management Forecasts. BofA Securities calculated a terminal value for the Company by applying an assumed perpetuity growth rate range of negative 1.00% to 1.00%, reflecting guidance provided by the management of the Company, to the terminal year unlevered free cash flows. The unlevered free cash flows and the terminal values were discounted to September 30, 2023, utilizing mid-year discounting convention, and using discount rates ranging from 10.00% to 12.00%, which were based on an estimate of the Company's weighted average cost of capital, derived using the capital asset pricing model.

BofA Securities then calculated implied per share equity value reference ranges (rounded to the nearest $0.05) for the Company by (i) adding to this range of present values the net cash of the Company of $1,295 million as of September 30, 2023 and (ii) dividing the result by the number of fully-diluted Taro shares outstanding of 37.587 million (calculated on a treasury stock method basis, based on information provided by the management of the Company). This analysis indicated the following approximate implied equity value reference range per Taro ordinary share (rounded to the nearest $0.05) for the Company, as compared to the merger consideration, the closing price per Taro ordinary share as of January 16, 2024, the Revised Offer Unaffected Share Price, and the Unaffected Share Price:

| Implied Equity Value Reference Range Per Share | Merger Consideration | January 16, 2024 Closing Price Per Share | Revised Offer Unaffected Share Price | Unaffected Share Price |
|---|---|---|---|---|
| $40.50 – $44.50 | $    43.00 | $    41.04 | $    37.89 | $    28.97 |

45.    In other words, the Proxy indicates that BofA Securities calculated the equity value range of $40.50 to $44.50 per share by:

      i.    calculating a range for Taro's aggregate enterprise value by adding up the present values of Taro's projected cash flows and terminal value at the end of the projection period,

      ii.    calculating a range for Taro's aggregate equity value by adding to the range of its aggregate enterprise values "the net cash of the Company of $1,295 million as of September 30, 2023," and

      iii.    calculating a range for Taro's per-share equity value by dividing the range of Taro's aggregate equity value by Taro's fully diluted share-count, which was 37.587 million.

46.    However, the presentations that were filed as exhibits to Taro's Schedule 13E-3 tell a different story. The description in the Proxy concealed the fact that BofA Securities did not just add $1,295 million in net cash as of September 30, 2023, it also accounted for the $141 million Litigation Loss Contingency by reducing the net cash amount to $1,155 million:

## Discounted Cash Flow Financial Analysis
Turtle Management Projections

Confidential

| | Q3-4 24E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | Terminal [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Management Projections** | | | | | | | | | | | | |
| **Fiscal Year Ending March 31,** | | | | | | | | | | | | |
| Net Revenue | $315 | $644 | $701 | $757 | $789 | $820 | $849 | $877 | $903 | $927 | $949 | $949 |
| % Growth | | 2.3% | 8.9% | 8.0% | 4.2% | 3.9% | 3.6% | 3.3% | 3.0% | 2.7% | 2.3% | |
| Adj. EBITDA [2] | $17 | $45 | $67 | $88 | $98 | $101 | $104 | $106 | $108 | $110 | $111 | $111 |
| % Margin | 5.5% | 7.0% | 9.6% | 11.6% | 12.4% | 12.3% | 12.2% | 12.1% | 12.0% | 11.8% | 11.7% | 11.7% |
| Less: Depreciation & Amortization | (16) | (33) | (36) | (39) | (41) | (42) | (44) | (45) | (46) | (48) | (49) | (23) |
| Adj. EBIT [2] | $1 | $12 | $31 | $49 | $57 | $59 | $60 | $61 | $62 | $62 | $62 | $88 |
| % Margin | 0.4% | 1.9% | 4.5% | 6.4% | 7.2% | 7.1% | 7.1% | 6.9% | 6.8% | 6.7% | 6.6% | 9.3% |
| Less: Taxes | (0) | (2) | (6) | (10) | (11) | (12) | (12) | (12) | (12) | (12) | (12) | (18) |
| Memo: Effective Tax Rate | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% |
| Tax-Effected Adj. EBIT [2] | $1 | $10 | $25 | $39 | $46 | $47 | $48 | $49 | $49 | $50 | $50 | $70 |
| Plus: Depreciation & Amortization | 16 | 33 | 36 | 39 | 41 | 42 | 44 | 45 | 46 | 48 | 49 | 23 |
| Less: Change in NWC | (15) | (1) | (24) | (24) | (10) | (17) | (17) | (16) | (15) | (13) | (12) | -- |
| Less: Capital Expenditures | (27) | (22) | (27) | (22) | (23) | (23) | (24) | (24) | (25) | (25) | (26) | (26) |
| **Unlevered Free Cash Flow** | ($25) | $20 | $10 | $32 | $53 | $48 | $51 | $54 | $57 | $59 | $61 | $68 |

**Perpetuity Growth Method**

| Discount Rate | PV of Q3-4 '24E - '34E Cash Flows | PV of Terminal Value at Perpetuity Growth Rate of | | | Enterprise Value at Perpetuity Growth Rate of | | |
|---|---|---|---|---|---|---|---|
| | | (1.00%) | 0.00% | 1.00% | (1.00%) | 0.00% | 1.00% |
| 10.00% | $224 | $236 | $262 | $294 | $460 | $486 | $518 |
| 11.00% | 211 + | 198 | 218 | 242 | = | 409 | 429 | 453 |
| 12.00% | 200 | 167 | 182 | 201 | 367 | 382 | 401 |

| Discount Rate | Plus: Q2' 24A Net Cash [3] | Equity Value at Perpetuity Growth Rate of | | | Equity Value per Share at Perpetuity Growth Rate of | | | Implied Adj. EBITDA Multiple at Perpetuity Growth Rate of | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | (1.00%) | 0.00% | 1.00% | (1.00%) | 0.00% | 1.00% | (1.00%) | 0.00% | 1.00% |
| 10.00% | $1,155 | $1,615 | $1,641 | $1,673 | $42.95 | $43.65 | $44.50 | 5.8x | 6.4x | 7.2x |
| 11.00% | 1,155 | 1,564 | 1,584 | 1,608 | 41.60 | 42.15 | 42.80 | 5.3 | 5.9 | 6.5 |
| 12.00% | 1,155 | 1,521 | 1,537 | 1,556 | 40.50 | 40.90 | 41.40 | 4.9 | 5.4 | 5.9 |

Source: Turtle Management Projections.

Note: US Dollars in millions, except per share values. Turtle fiscal year end March 31. Cash flows discounted to September 30, 2023 using mid-year discount convention. Equity value per share rounded to nearest $0.05.
[1] Terminal year assumes normalized depreciation equal to 90.7% of capital expenditures and normalized change in net working capital equal to 2034E change in net working capital, as a percentage of revenue, applied to the midpoint of the perpetuity growth rate of 0.00%.
[2] Burdened for Bank Fees, Rental Income, Royalty Income and All Other Items.
[3] Net cash represents ~$30.70 per share. Net cash includes $269mm cash & equivalents, $120mm bank deposits and $906mm marketable securities as of September 30, 2023, and $141mm settlement and loss contingencies as of June 30, 2023.

47.    The "Plus: Q2' 24A Net Cash" adjustment from enterprise value to equity value was not $1,295 million as stated in the Proxy but $1,155 million.

48.    Note 3 above details the $1,155 million "Q2' 24A Net Cash" amount:

*Net cash represents ~$30.70 per share.  Net cash includes $269mm cash & equivalents, $120mm bank deposits and $906mm marketable securities as of September 30, 2023, **and $141mm settlement and loss contingencies** as of June 30, 2023.*

49.    The Proxy stated that BofA Securities calculated Taro's aggregate equity value range by "adding to this range of present [enterprise] values the net cash of the Company of $1,295 million as of September 30, 2023" even though BofA Securities actually calculated the implied equity value range by adding to the range of present enterprise values of $1,155 million.

50.    The Proxy concealed the fact that the equity value range that BofA Securities' discounted cash flow analysis implied accounted for the $141 million Litigation Loss Contingency by reducing the net cash amount from $1,295 million to $1,155 million.

51.    The Proxy also stated that BofA Securities performed a comparable companies multiples analysis, which is a relative valuation analysis that estimates a company's value based on the trading multiples observed for comparable publicly traded companies, and describes BofA Securities' comparable companies multiples analysis as follows:

*Selected Publicly Traded Companies Analysis*

BofA Securities reviewed publicly available financial and stock market information for the Company and the following seven selected publicly traded companies that specialize in developing and manufacturing generic pharmaceuticals that, based on financial, business and operating characteristics, BofA Securities, in its professional judgment and experience, considered sufficiently relevant for purposes of this analysis:

- Amneal Pharmaceuticals Inc.
- Amphastar Pharmaceuticals Inc.
- ANI Pharmaceuticals, Inc.
- Aspen Pharmacare Holdings ADR
- Aurobindo Pharma Ltd
- Glenmark Pharmaceuticals Ltd
- Hikma Pharmaceuticals Plc

BofA Securities reviewed, among other information, enterprise values for each of the selected publicly traded companies, and for the Company, calculated as equity value based on closing stock prices of the applicable company on January 16, 2024, plus debt, preferred equity and non-controlling interest (as applicable), and less cash and cash equivalents (as applicable), as a multiple of estimated calendar years 2023 and 2024 adjusted earnings before interest, taxes, depreciation and amortization, or EBITDA, for the applicable company.

Financial data of the selected publicly traded companies were based on public filings and publicly available Wall Street research analysts' estimates published by FactSet as of January 16, 2024. Financial data of the Company was derived from the Management Forecasts and equity information provided by the management of the Company. The calendar year 2023 and 2024 enterprise value to EBITDA multiples observed for the selected publicly traded companies were as follows:

| Selected Publicly Traded Company | Enterprise Value $(bn) | Enterprise Value /2023 EBITDA Multiple | Enterprise Value /2024 EBITDA Multiple |
|---|---|---|---|
| Amneal Pharmaceuticals Inc. | $ 4.2 | 7.6x | 7.2x |
| Amphastar Pharmaceuticals Inc. | $ 3.3 | 12.7x | 10.7x |
| ANI Pharmaceuticals, Inc. | $ 1.4 | 10.4x | 10.4x |
| Aspen Pharmacare Holdings ADR | $ 5.7 | 9.8x | 8.6x |
| Aurobindo Pharma Ltd | $ 7.7 | 12.6x | 10.4x |
| Glenmark Pharmaceuticals Ltd | $ 3.5 | 13.2x | 11.9x |
| Hikma Pharmaceuticals Plc | $ 6.7 | 8.6x | 8.3x |
| Median | $ 4.2 | 10.4x | 10.4x |
| Mean | $ 4.6 | 10.7x | 9.6x |
| Taro Pharmaceuticals | $ 0.4 | 10.3x | 9.1x |

BofA Securities also calculated and compared the average last-twelve-months EBITDA multiples for the selected publicly traded companies as a group and for the Company, as of January 16, 2024, and (i) for calendar years 2019, 2020, 2021 and 2022, and (ii) for the one-year, three-year and five-year periods ending May 25, 2023, which represents the day prior to disclosure of Sun Pharma's initial offer to acquire all of the Taro ordinary shares (the "Unaffected Date"). Financial data of the Company and the selected publicly traded companies in this review were based on public filings and publicly available Wall Street research analysts' estimates published by FactSet as of January 16, 2024. The current and historical average last-twelve-months EBITDA multiples observed for the selected publicly traded companies as a group and for the Company were as follows:

**Current Average Enterprise Values to Last-Twelve-Months EBITDA Multiples**

|  | 2019CY | 2020CY | 2021CY | 2022CY | LTM | Last 3 Years | Last 5 Years |
|---|---|---|---|---|---|---|---|
| Selected Companies | 10.9x | 10.3x | 9.7x | 7.9x | 8.0x | 9.1x | 9.7x |
| Company | 6.8x | 3.9x | 7.5x | 2.9x | 1.7x | 4.5x | 5.1x |
| Company Discount (%) | (37%) | (62%) | (23%) | (63%) | (79%) | (50%) | (47%) |
| Company Discount (x) | (4.0x) | (6.4x) | (2.2x) | (5.0x) | (6.3x) | (4.6x) | (4.6x) |

Based on BofA Securities' review of the enterprise values to adjusted EBITDA multiples observed for the selected publicly traded companies and on its professional judgment and experience, BofA Securities applied an adjusted EBITDA multiple reference range of 7.6x to 13.5x to the estimates of calendar year 2023 adjusted EBITDA for the Company as reflected in the Management Forecasts, and an adjusted EBITDA multiple reference range of 7.2x to 12.0x to the estimates of calendar year 2024 adjusted EBITDA for the Company as reflected in the Management Forecasts, to calculate a range of implied enterprise values for the Company. Additionally, based on BofA Securities' review of the enterprise values to adjusted EBITDA multiples observed for the selected publicly traded companies, as well as historical last-twelve-months EBITDA multiples for the selected publicly traded companies and historical trading prices of Taro ordinary shares and the common stock of the selected publicly traded companies, and on its professional judgment and experience, BofA Securities applied an adjusted EBITDA multiple

reference range of 4.2x to 7.5x to the estimates of calendar year 2023 adjusted EBITDA for the Company as reflected in the Management Forecasts, to calculate a range of implied enterprise values for the Company. BofA Securities then calculated an implied equity value per share reference range for the Company (rounded to the nearest $0.05) by adding to these ranges of implied enterprise values an estimate of the net cash of the Company of $1,295 million as of September 30, 2023, as provided by the management of the Company, and dividing the results by the number of fully-diluted Taro shares outstanding of 37.587 million (calculated on a treasury stock method basis, based on information provided by the management of the Company).

This analysis indicated the following approximate implied equity value reference ranges per share, as compared to the merger consideration, the closing price per Taro ordinary share as of January 16, 2024, the closing price per Taro ordinary share as of December 8, 2023, the day prior to disclosure of the revised offer price (the "Revised Offer Unaffected Share Price"), and the closing price per Taro ordinary share as of the Unaffected Date (the "Unaffected Share Price"):

| Implied Equity Value Reference Range Per Share | | | | | | |
|---|---|---|---|---|---|---|
| EV / 2023E EBITDA (Unadjusted for historical trading) | EV / 2024E EBITDA (Unadjusted for historical trading) | EV / 2023E EBITDA (Adjusted for historical trading) | Merger Consideration | January 16, 2024 Closing Price Per Share | Revised Offer Unaffected Share Price | Unaffected Share Price |
| $38.35 – $44.30 | $ 38.90 – $44.30 | $ 34.95 – $38.25 | $ 43.00 | $ 41.04 | $ 37.89 | $ 28.97 |

No selected publicly traded company used in this analysis is identical or directly comparable to the Company. Accordingly, an evaluation of the results of this analysis is not entirely mathematical. Rather, this analysis involves complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the public trading or other values of the companies to which the Company was compared.

52. Thus, the Proxy disclosed that BofA Securities calculated the equity value per-share reference ranges by:

     i.     calculating the aggregate enterprise value ranges for Taro by applying the ranges of valuation multiples that BofA Securities selected to the metrics in Taro's financial forecasts; and then

     ii.     calculating the aggregate equity value ranges for Taro by "adding to these ranges of implied enterprise values an estimate of the net cash of the Company of $1,295 million as of September 30, 2023, as provided by the management of the Company," and

iii.    calculating the per-share equity value ranges for Taro by dividing the results

by Taro's fully diluted share-count of 37.587 million shares.

53.    This was materially false and misleading.  As with the discounted cash flow analysis,

BofA Securities actually added a net cash amount of $1,155 million because BofA Securities had

applied the $141 million Litigation Loss Contingency reduced to the $1,295 million in net cash

balance as of September 30, 2023.

54.    BofA Securities' presentation to the Special Committee of Taro's Board of Directors

on January 17, 2024 indicated that BofA Securities applied its selected ranges of multiples to

projected 2023E Adj. EBITDA, and 2024E Adj. EBITDA amounts of $38 million and $43 million,

respectively:





55. Reproducing these calculations shows that BofA Securities did not add $1,295 million in net cash, it added $1,155 million:

| 2023E EBITDA | Unadjusted Multiple | Net Cash | Equity Value | No. Shares | Equity Value Per Share Excluding Contingency | Loss Contingency | Equity Value Per Share Including Contingency |
|---|---|---|---|---|---|---|---|
| 38 | 7.6 | 1295 | 1583.8 | 37.587 | $42.14 | 141 | $38.39 |
| 38 | 13.5 | 1295 | 1808 | 37.587 | $48.10 | 141 | $44.35 |

| 2024E EBITDA | Multiple | Net Cash | Equity Value | No. Shares | Equity Value Per Share Excluding Contingency | Loss Contingency | Equity Value Per Share Including Contingency |
|---|---|---|---|---|---|---|---|
| 43 | 7.2 | 1295 | 1604.6 | 37.587 | $42.69 | 141 | $38.94 |
| 43 | 12 | 1295 | 1811 | 37.587 | $48.18 | 141 | $44.43 |

| 2023E EBITDA | Adjusted Multiple | Net Cash | Equity Value | No. Shares | Equity Value Per Share Excluding Contingency | Loss Contingency | Equity Value Per Share Including Contingency |
|---|---|---|---|---|---|---|---|
| 38 | 4.2 | 1295 | 1454.6 | 37.587 | $38.70 | 141 | $34.95 |
| 38 | 7.5 | 1295 | 1580 | 37.587 | $42.04 | 141 | $38.28 |

56.    The Proxy also contained a "Discounted Cash Flow Sensitivity Analysis" that further suggested that BofA Securities had not yet accounted for the $141 million in loss contingencies:

*Discounted Cash Flow Sensitivity Analysis.* At the direction of and based on sensitivity inputs provided by the Special Committee, BofA Securities also performed a sensitivity analysis to analyze the implied impact on the approximate implied equity value reference range per Taro ordinary share derived from the **Discounted Cash Flow analysis described above under the heading "*Summary of Material Company Financial Analyses—Discounted Cash Flow Analysis*" by varying certain of the Management Forecasts as described in the table below. The following table presents the** results of this analysis:

| Metric | Sensitivity Analysis | Impact on Implied Equity Value Reference Range Per Share |
|---|---|---|
| Litigation Accrual | Incremental $141M | ($3.75) |
| Adj. EBITDA Margin | - / + 1.0% | ($1.65) / $1.65 |
| Discount Rate | - / + 1.0% | ($1.25) / $1.50 |
| Annual Revenue Growth Rate | - / + 1.0% | ($0.65) / $0.70 |
| Perpetuity Growth Rate | - / + 1.0% | ($0.55) / $0.65 |

57. Unlike the Proxy, BofA Securities' presentation confirms that the "Incremental $141M" amount referred not to the $141 million Litigation Loss Contingency that the Taro Board had actually approved, but to an "impact of additional Settlement and Loss Contingency" that "was advocated by management and ***rejected*** by the Special Committee":





(4)    *Impact of the incremental liability amount was advocated by management and rejected by the Special Committee.*

58.    BofA Securities' presentation informed Taro's Special Committee that the "Incremental $141M" was an "additional Settlement and Loss contingency" that had been "advocated by management" (which was affiliated with Sun Pharma) but "rejected by the Special Committee" (which was not affiliated with Sun Pharma).

59.    Further, because the Proxy conceals the fact that BofA Securities' other valuation analyses had already accounted for the $141 million Litigation Loss Contingency that the Special Committee had actually approved, any reasonable Taro shareholder would assume that the "Incremental $141M" referred to the incremental impact that accounting for the $141 million Litigation Loss Contingency would have.  In fact, the $3.75 per share impact of the "Incremental $141M" was the effect of assuming the ***additional*** $141 million in liabilities that Sun Pharma had advocated for, and the Special Committee had specifically rejected.

60.     Taro's public stockholders are not expected to comb through the exhibits to the Schedule 13E-3 to validate information that the Proxy purported to clearly disclose.[4]

61.     The Proxy's consistent attempt to use the $141 million Litigation Loss Contingency to undervalue Taro misled Taro public stockholders to believe that Taro was less valuable than the value assumed by BofA Securities analyses.  Such misrepresentations clearly created a divergence of interests between Sun Pharma (as the majority stockholder) and the minority public stockholders.  By reducing the value of Taro, Sun Pharma reaped millions of dollars of benefit by underpaying for Taro.  As noted in a pertinent article:

> Controlling shareholders have many motivations for squeezing out the minority shareholders in companies they control such as, seeking to gain access to target assets, eliminating the costs of public ownership, capturing gains from synergies in operating the target company, or eliminating future concerns for self-dealing by placing all operations under a single entity, to name a just a few. In eliminating public shareholders from the company, some of the controllers' actions may benefit all shareholders of the company on a pro rata basis, while others lead to gains that are disproportionately appropriated by the controller. In the former situation, the law defers to the self-interest of the controlling shareholder because its actions bestow proportionate gains to all of the investors. However, where the controller engages in self-dealing conduct, resulting in it getting more than its fair share of the benefits from its actions, then the controlling shareholders' fiduciary duties are triggered and the court will review the fairness of the underlying transaction.

---

[4] *See United Paperwokers Int'l Union v. International Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("The mere fact that a company has filed with a regulatory agency documents containing factual information material to a proposal as to which proxies are sought plainly does not mean that the company has made adequate disclosure to shareholders under Rule 14a-9."); *see also City of Warren Gen. Emples. Ret. Sys. v. Roche*, C.A. No. 2019-0740-PAF, 2020 Del. Ch. LEXIS 352, at *67 (Del. Ch. Nov. 30, 2020) (rejecting defendants' argument that a proxy statement did not describe one of the terms in the merger agreement in a materially misleading manner where the merger agreement itself was attached to the proxy statement because "[a]ttaching the Merger Agreement does not cure the Proxy's inaccurate and misleading disclosure" and "[a] reasonable stockholder is not required to validate each disclosure by reference to the underlying contract.").

James D. Cox & Randall S. Thomas, *Delaware's Retreat: Exploring Developing Fissures and Tectonics Shifts in Delaware Corporation Law,* 42 Del. J. Corp. L. 323, 341 (2018) (footnotes omitted).

> **2.     The Proxy Concealed the Fact that Taro Had Agreed in Principle to Resolve Certain Litigation While the Process Was Ongoing**

62.     *Second*, the Proxy concealed the fact that Taro had already agreed in principle to resolve litigation that, upon information and belief, was included in the $141 million Litigation Loss Contingency.

63.     The Proxy affirmatively stated that part of the reason Sun Pharma (and, by extension, Taro management) believed that the total cost to resolve Taro's pending litigation would exceed the $141 million Litigation Loss Contingency that the Taro Board had approved was that the $141 million Litigation Loss Contingency was based on aggregating and extrapolating from settlement offers that Taro had made to plaintiffs, all of which had been rejected and, accordingly, the expected loss from the pending litigation "would, by definition, be higher than $141 million."

64.     The Proxy did not disclose the actual offers that were rejected, but the fact that the $141 million Litigation Loss Contingency was based not only on ***aggregating*** those offers but also on ***extrapolating from them*** suggests that the $141 million Litigation Loss Contingency was based on the assumptions that Taro's offers would be rejected and resolved at amounts that were significantly greater than the amounts that Taro was actually offering.

65.     Moreover, while the Proxy affirmatively stated that Sun Pharma and Taro management had advocated for a higher Litigation Loss Contingency on December 7, 2023 on the grounds that all of Taro's offers that the $141 million Litigation Loss Contingency was extrapolated from had been "rejected" such that resolving this litigation "would, by definition, be higher than $141 million," the Proxy did not disclose the fact that Taro had already agreed to a

settlement in principle to resolve at least one case in September 2023, approximately six weeks before Sun Pharma and Taro had argued for a higher litigation loss contingency amount because all of Taro's settlement offers had been rejected. *See Speakes v. Taro Pharmaceutical Industries, Ltd.*, No. 16-cv-08318-ALC-OTW, Dkt. No. 101-1 ("Stipulation and Agreement of Settlement"), ¶ H, *filed* Apr. 15, 2024 (S.D.N.Y.)  ("On September 26, 2023, the Parties agreed in principle to settle the Action for $36,000,000, subject to the execution of a customary stipulation and agreement of settlement and related papers.").

66.    The *Speakes* Settlement resolved a securities class action that was predicated on the impact of "concurrent multi-district litigation involving civil antitrust cases against generic pharmaceutical companies" and the plaintiff in *Speakes* had coordinated discovery production with those "parallel proceedings."  *Speakes* Settlement, ¶ G.

67.    The Proxy identified the "Pending Litigation" with respect to the $141 million Litigation Loss Contingency as "Taro's ongoing multi-jurisdiction civil antitrust matters."

68.    On or about December 4, 2023, BofA Securities made a presentation to Taro entitled *Turtle Litigation & Settlements Overview* that confirmed that Taro had already paid any civil antitrust penalties associated with U.S. Department of Justice investigations and the remaining Litigation Loss Contingency was to resolve litigation "related to ongoing multi-jurisdiction civil antitrust matters."  Although the *Speakes* litigation was not a civil antitrust matter, it was clearly litigation "related to ongoing multi-jurisdiction civil antitrust matters."

69.    When the Taro Board approved the $141 million Litigation Loss Contingency, it was well aware that the claims in the *Speakes* litigation, which were based on alleged securities violations that were predicated on "Taro's ongoing multi-jurisdiction civil antitrust matters," were a substantial liability. Upon information and belief, Taro's Board accounted for Taro's potential

liability arising from of the *Speakes* litigation in the $141 million Litigation Loss Contingency that it approved.

70.    The Proxy concealed the fact that Taro had agreed to resolve the *Speakes* litigation and the extent to which the resolution of the *Speakes* litigation would have impacted the $141 million Litigation Loss Contingency.

71.    Moreover, the fact that there may not have been a definitive settlement agreement for the *Speakes* Settlement at the time Taro and Sun Pharma entered into the Merger Agreement could not have been grounds to conceal the *Speakes* Settlement because the *Speakes* Settlement was finalized at least as early as April 10, 2024, and filed along with the motion for court approval in the *Speakes* action on or about April 15, 2024, more than a month before the Shareholder Vote.

### 3.    The Proxy did not Disclose the Reports and/or Opinions of ISS and Glass Lewis

72.    *Third*, on May 8, 2024, shortly before the Shareholder Vote, Taro amended its Schedule 13E-3 filing touting the opinions of two proxy advisory firms, Institutional Shareholder Services ("ISS") and Glass Lewis & Co. ("Glass Lewis"), which had "recommended" that Taro's shareholders vote for the Transaction.

73.    Taro touted these recommendations as opinions materially related to the Transaction without making the written opinions and reports available to shareholders, summarizing or describing ISS and Glass Lewis' methodologies, procedures, and assumptions, or disclosing whether Taro had paid ISS and Glass Lewis for these recommendations.

74.    Because Sun Pharma was Taro's majority shareholder, the Transaction was a "13E3 Transaction" as defined in 17 C.F.R. § 240.13e-3(a)(3) and Taro and Sun Pharma were required to file and update its Schedule 13E-3 to disclose all of the information specified in 17 C.F.R. § 240.13e-100.

75.  Item 9 of 17 C.F.R. § 240.13e-100 requires the filer to "furnish the information required by Item 1015 of Regulation M-A (§ 229.1015 of this chapter)."

76.  17 C.F.R. § 229.1015 states:

§ 229.1015 (Item 1015) Reports, opinions, appraisals and negotiations.

(a)  Report, opinion or appraisal. State whether or not the subject company or affiliate has received any report, opinion (other than an opinion of counsel) or appraisal from an outside party that is materially related to the Rule 13e-3 transaction, including, but not limited to: Any report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates.

(b)  Preparer and summary of the report, opinion or appraisal. For each report, opinion or appraisal described in response to paragraph (a) of this section or any negotiation or report described in response to Item 1014(d) of Regulation M-A (§ 229.1014) or Item 14(b)(6) of Schedule 14A (§ 240.14a-101 of this chapter) concerning the terms of the transaction:

(1)  Identify the outside party and/or unaffiliated representative;

(2)  Briefly describe the qualifications of the outside party and/or unaffiliated representative;

(3)  Describe the method of selection of the outside party and/or unaffiliated representative;

(4)  Describe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between:

(i)  The outside party, its affiliates, and/or unaffiliated representative; and

(ii)  The subject company or its affiliates;

(c)  Availability of documents. Furnish a statement to the effect that the report, opinion or appraisal will be made available for inspection and copying at the principal executive offices of the subject company or affiliate during its regular business hours by any interested equity security holder of the subject company or representative who has been so designated in writing. This statement also may provide that a copy of the report, opinion or appraisal

will be transmitted by the subject company or affiliate to any interested equity security holder of the subject company or representative who has been so designated in writing upon written request and at the expense of the requesting security holder.

77.    On or about May 8, 2024 Taro filed an amendment to its Schedule 13E-3 to announce "that leading independent proxy advisory firms Institutional Shareholder Services (ISS) and Glass Lewis & Co. ("Glass Lewis") have both recommended that Taro shareholders vote "**FOR**" the pending Merger transaction with Sun Pharmaceutical Industries Ltd. ("Sun Pharma") at the upcoming May 22, 2024, extraordinary general meeting of shareholders."

78.    The recommendations that Taro touted from ISS and Glass Lewis were reports, opinions, or appraisals that were "materially related to the Rule 13e-3 transaction."

79.    Taro did not identify its relationships with ISS or Glass Lewis, or identify whether Taro or any of its affiliates had paid ISS or Glass Lewis in connection with its reports.

80.    Taro also did not summarize the methodology or assumptions that ISS and Glass Lewis had made in preparing their reports and did not make ISS and Glass Lewis' reports available to Taro's shareholders so that they could review the reports themselves to determine how much weight to put in ISS and Glass Lewis' opinion and know what factors ISS and Glass Lewis considered and whether ISS or Glass Lewis had qualified their opinions that Taro's shareholders should to approve the Transaction.

### III.  Taro and Sun Pharma Concealed the Results of the Shareholder Vote

81.    The Proxy Statement stated that the Shareholder meeting was set for May 22, 2024.

82.    On May 23, 2024, Taro announced that the Transaction had been approved by shareholder vote, although it did not announce the number of votes in favor and against the Transaction.

83.    When Sun Pharma and Taro reported that the Transaction had closed on June 24, 2024 and Taro ceased to be a publicly traded company and stopped reporting to the SEC, they still had not disclosed the voting results notwithstanding the structure of the Shareholder Vote and the fact there were significant open questions as to whether Taro satisfied the Majority of the Minority Vote condition in light of the opposition that the Transaction faced from Krensavage, Taro's second-largest shareholder.

84.    Indeed, in an email dated May 23, 2023 to Defendant Benshoshan, Michael Krensavage, Managing Member of Krensavage, sought information about the voting results of the Transaction.  The May 23 email stated: "Please provide the vote count for the Taro's sale to Sun and confirm how you recorded the Taro shares that we control. If you are unable to do so, please tell me the process for obtaining voting information."

85.    In an email reply dated May 28, 2023, Defendant Benshoshan stated that she "forwarded your request to Taro."  As of the date of this filing, Krensavage's May 23 email request remained unanswered.

## IV.    Plaintiff and Class members were Damaged by Defendants' Misrepresentations

86.    In his preliminary analysis and review of the publicly available information regarding the Transaction, Plaintiff, in consultation with a damages expert, has concluded that the Class and he were damaged significantly under several damages models and frameworks.

87.    Using a strictly market approach, Plaintiff has concluded that the EV/R multiple (lower quartile) suggests a fair value of Taro of approximately $70 per share, or $27 per share more than the Merger Consideration.  An EV/EBITDA (median) multiple suggests a fair value of Taro of approximately $56 per share or $13 per share more than the Merger Consideration.

88.    Using an income approach (DCF), it appears that BofA Securities assumed unreasonably high discount rates and unreasonably low perpetuity growth rates, and Taro's cash flow projections were unreasonably low.  Indeed, as Krensavage noted in its letters urging other minority shareholders to oppose the Transaction, when Sun Pharma had attempted to acquire Taro in 2013, Taro management had provided financial forecasts that understated Taro's actual net income by $1.2 billion.[5]

89.    Finally, as a general proposition of damages suffered by Plaintiff and the Class, Plaintiff has identified a mismatch between (a) what is being bought (an unencumbered remaining equity interest in the hands of the already-controlling buyer—Sun Pharma) and (b) what is being sold (a minority interest historically encumbered by low liquidity and an already-controlling buyer (Sun) with a conflict of interests). BofA Securities resolved this "mismatch" in favor of Sun Pharma by choosing a low multiple explicitly reflecting Taro's historical disadvantage.

90.    Upon information and belief, the Transaction met with substantial disapproval from the minority shareholders even with the incomplete and misleading Proxy, and would not have satisfied the Majority of the Minority Vote Condition if the Proxy had fairly, fully, and truthfully disclosed all of the material information about the structure and financial fairness of the Transaction.

---

[5] https://www.prnewswire.com/news-releases/taro-pharmaceutical-board-relies-on-flawed-analysis-to-shortchange-minority-shareholders-302123991.html

91.

## COUNT I

**On Behalf of Plaintiff and the Class Against Taro and the Individual Defendants for Violations of Sections 13(e) and 14(a) of the Exchange Act and Rules 13e-3 and 14a-9 Promulgated Thereunder**

92.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

93.    Section 13(e) of the Exchange Act makes it unlawful for the controlling shareholder of an issuer to purchase the issuer's stock unless the controlling shareholder and issuer comply with the rules promulgated by the SEC.

94.    Rule 13e-3, promulgated by the SEC pursuant to Section 13(e) of the Exchange Act, sets forth a detailed set of disclosure requirements governing such "going private" transactions.

95.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

96.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

97.     The omission of information from a proxy statement will violate Sections 13(e), Rule 13e-3, Section 14(a), and Rule 14a-9 if SEC regulations and schedules specifically require disclosure of the omitted information or if the information otherwise renders the information in the proxy statement materially false or misleading.

98.     Taro and the Individual Defendants issued the Proxy with the intention of soliciting shareholder support for the Transaction. Each of Taro and the Individual Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which failed to provide critical information regarding BofA Securities' methodology and key assumptions in describing the valuation analyses that BofA Securities performed.

99.     In so doing, Taro and the Individual Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information.  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

100.    Taro and the Individual Defendants knew or were negligent in not knowing that the Proxy was materially misleading and omitted material facts that were necessary to render it not misleading. Taro and the Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Transaction.

101.    The Proxy misrepresented information concerning the methodology and key assumptions underlying the fairness opinion and valuation analyses that were prepared by BofA

Securities, including the fact that BofA Securities had assumed a "net cash" amount of $1,155 million rather than $1,295 million because it had subtracted the $141 million Litigation Loss Contingency to calculate Taro's net cash.

102.  The Proxy also concealed information about the $141 million Litigation Loss Contingency, including information about the *Speakes* Settlement, which rendered the statements that Sun Pharma and Taro management advocated for an increase to the $141 million Litigation Loss Contingency amount because the $141 million amount was "extrapolated" from settlement offers that had been rejected a half-truth at best

103.  The Proxy also concealed information about the opinions that Taro touted from ISS and Glass Lewis, including information that shareholders needed to determine how much weight to put into ISS an Glass Lewis' opinions that Taro shareholders should vote in favor of the Transaction.

104.  Taro also concealed the results of the Shareholder Vote, presumably because disclosure would have shown that the public did not view the Transaction favorably.

105.  Taro and the Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy and Schedule 13E-3. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Taro and the Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully. Indeed, Taro and the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of Taro's financial projections.

106.  Taro was also deemed negligent as a result of the Individual Defendants negligence in preparing and reviewing the Proxy.

107.  The misrepresentations and omissions in the Proxy and Schedule 13E-3 were material to Plaintiff and the Class, and deprived them of their right to cast an informed vote.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants and Sun Pharma for Violations of Section 20(a) of the Exchange Act**

108.  Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

109.  The Individual Defendants and Sun Pharma acted as controlling persons of Taro within the meaning of Section 20(a) of the Exchange Act as alleged herein. Sun Pharma and its affiliates controlled 85.7% of Taro's total voting power. By virtue of their positions as directors of Taro, and participation in and/or awareness of the Taro's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy and Schedule 13E-3 filed with the SEC, the Individual Directors had the power to influence and control, and indeed did influence and control, directly or indirectly, the decision making of Taro, including the content and dissemination of the statements that Plaintiff contends are materially incomplete and misleading.

110.  Each of the Individual Defendants and Sun Pharma were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

111.  In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Taro, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations

alleged herein by failing to exercise due diligence or oversight in their review and dissemination of the Proxy and other statements. The omitted information identified above was reviewed by the Board and Sun Pharma prior to voting on the Transaction. The Proxy and Schedule 13E-3 at issue contained the unanimous recommendation of the Board to approve the Transaction. Sun Pharma and the Individual Defendants were thus directly involved in the making of the Proxy and Schedule 13E-3.

112.  In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy and Schedule 13E-3 purport to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

113.  By virtue of the foregoing, Sun Pharma and the Individual Defendants have violated Section 20(a) of the Exchange Act.

114.  As set forth above, the Individual Defendants and Sun Pharma had the ability to exercise control over and did control a person or persons who have each violated Sections 13(e) and 14(a) and Rules 13e-3 and 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' and Sun Pharma's conduct, Plaintiff and the Class were harmed.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.  Declaring that this action is properly maintainable as a Class Action and certifying Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.  Awarding Plaintiffs and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

C.  Awarding Plaintiffs and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.  Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.  Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 17, 2024                    Respectfully submitted,


/s/Mitchell Breit_____
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
Mitchell Breit
(New York Bar No 2337954)
405 East 50th Street
New York, 10022
Telephone: (212) 946-9306
mbreit@milberg.com

**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
Arthur Stock*
 800 S. Gay Street, Suite 1100
 Knoxville, TN 37929
 Telephone: (865) 247-0080
 astock@milberg.com

**ADEMI LLP**
Guri Ademi**
Jesse Fruchter**
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
gademi@ademilaw.com
jfruchter@ademilaw.com

*Counsel for Plaintiff*

* Admitted *pro hac*

**Motion for *pro hac* admission forthcoming