UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
NEAL A. MITCHELL, Individually and on Behalf
of All Others Similarly Situated,

                         Plaintiff,

   - against -

TARO PHARMACEUTICAL INDUSTRIES LTD.,
DILIP SHANGHVI, ABHAY GANDHI, UDAY
BALDOTA, LINDA BENSHOSHAN, JAMES
KEDROWSKI, ODED SARIG, ROBERT STEIN,
SUDHIR VALIA and SUN PHARMACEUTICAL
INDUSTRIES LTD.,

                       Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 24-CV-6818 (CS)

Appearances:

Arthur Stock
Milberg Coleman Bryson Phillips Grossman PLLC
Knoxville, Tennessee

Mitchell Breit
Tyler Litke
Milberg Coleman Bryson Phillips Grossman PLLC
New York, New York

Guri Ademi
Jesse Fruchter
Ademi LLP
Cudahy, Wisconsin
*Counsel for Plaintiff*

Jeffrey D. Hoschander
Samuel A. Stuckey
Allen Overy Shearman Sterling US LLP
New York, New York

Mallory Tosch Hoggatt
Allen Overy Shearman Sterling US LLP
Houston, Texas
*Counsel for Defendants*

Seibel, J.

Before the Court is the motion to dismiss of Defendants Taro Pharmaceutical Industries Ltd. ("Taro"); Sun Pharmaceutical Industries Ltd. ("Sun"); and Abhay Ghandi, Uday Baldota, and James Kedrowski (the "Individual Defendants," and together with Sun and Taro, "Defendants").  (ECF No. 38.)[1]  For the following reasons, the motion is GRANTED.

## I.    BACKGROUND

I accept as true the facts, but not the conclusions, as set forth in Plaintiff's Amended Complaint.  (ECF No. 37 ("AC").)

### A.    Facts

On January 17, 2024, Taro and Sun issued a joint press release announcing that they had entered into an agreement pursuant to which Sun would purchase for $43 per share all of the outstanding ordinary shares of Taro that it did not already own.  (AC ¶ 32.)  Sun – which is the largest pharmaceutical company in India and a leading generic drug company in the U.S. – was already Taro's majority shareholder and controlled 85.7% of Taro's voting power.  (*Id.* ¶¶ 26, 30.)  Sun had publicly expressed interest in acquiring Taro prior to the agreement, but faced opposition from minority shareholders who considered Sun's earlier proposals too low.  (*Id.* ¶ 31.)  Ultimately, Taro and Sun agreed on a price of $43 per share, which represented a 48% premium over the closing price per share on the last day before Sun submitted its first public

---

[1] The remaining Defendants (Dilip Shanghvi, Linda Benshoshan, Oded Sarig, Robert Stein and Sudhir Valia) were never served, nor did they agree to waive service.  Nonetheless, because the claims against these defendants are premised on the same allegations as those against the Individual Defendants, the Court has discretion to dismiss the claims against the non-moving defendants on the same grounds advanced by the moving Defendants.  *See Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 172 (S.D.N.Y. 2015); *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 359 (S.D.N.Y. 2014).

offer, as well as a 13% increase over Sun's initial proposed purchase price of $38 per share. (*Id.* ¶¶ 31-32.)

The merger agreement was unanimously recommended by a Special Committee of Taro's Board of Directors and Taro's Audit Committee, and approved by Taro's and Sun's Boards of Directors. (*Id.* ¶ 32.) On April 15, 2024, Taro filed a Schedule 13E-3[2] with the Securities and Exchange Commission ("SEC") and mailed a Proxy Statement to shareholders, soliciting them to vote in favor of the merger. (*Id.* ¶ 33; *see generally* ECF No. 40-1 ("Proxy Statement").) Because Taro was organized as an Israeli company, Israeli law required the merger to be approved by at least 75% of the voting power of the shares voted, as well as by the majority of the voting power of shares voted that were held by shareholders other than Sun – in other words, by a majority of the minority. (AC ¶¶ 29, 32.)

In the Proxy Statement, Taro summarized the background to the merger, the parties' negotiations, the factors that the Special Committee considered in assessing the fairness of the transaction, and the terms of the finalized agreement. (*See generally* Proxy Statement.) Taro also disclosed that it had retained BofA Securities, Inc. ("BofA") as its financial advisor in connection with the merger. (AC ¶ 32; Proxy Statement at 13.) The Proxy Statement informed shareholders that BofA had delivered an oral opinion to the Special Committee on January 17, 2024, which it then confirmed via a written opinion on the same date, stating that the merger consideration to be received by the minority shareholders was fair and explaining the financial bases for this conclusion. (AC ¶ 54; Proxy Statement at 13, 37-48.) The Proxy Statement

---

[2] A Schedule 13E-3 is a form containing detailed disclosures that issuers engaging in a going-private transaction must file with the SEC and amend with any material changes prior to the close of the transaction. 17 C.F.R. §§ 240.13e-3, 240.13e-100.

included a summary of BofA's opinion, which described several calculations that BofA performed to assess the fairness of the consideration. (Proxy Statement at 37-48.)

One of the calculations described was a discounted cash flow analysis, which involved (1) estimating Taro's aggregate enterprise value based on projected cash flows and terminal value at the end of the projection period, (2) adding the net cash of the company to estimate aggregate equity value, and (3) dividing this aggregate equity value by the number of shares to calculate per-share equity value. (AC ¶¶ 44-45; Proxy Statement at 42.) The summary also described the comparable companies multiples analysis BofA performed, which involved relying on trading multiples observed for comparable publicly traded companies to calculate Taro's implied enterprise values. (AC ¶¶ 51-52; Proxy Statement 40-42.) The Proxy Statement explained that BofA had "noted certain additional factors that were not considered part of [its] financial analyses with respect to its opinion but were referenced solely for informational purposes," including a sensitivity analysis that varied the discounted cash flow analysis by varying certain management forecasts. (Proxy Statement at 43; *see* AC ¶ 56.) In addition to summarizing BofA's financial analysis, the Proxy Statement attached the full text of BofA's written opinion to the Special Committee, (Proxy Statement Appendix B), and it cautioned shareholders that the summary was "qualified in its entirety by reference to the full text of the written opinion," (Proxy Statement at 38).

One of the considerations discussed throughout the Proxy Statement was the "Litigation Loss Contingency Amount," defined as "Taro's estimated litigation loss contingency amount related to Taro's ongoing multi-jurisdiction civil antitrust matters," which matters were defined as the "Pending Litigation." (*Id.* at 21.) In its fiscal year 2023 annual report, Taro explained that it was a defendant in a series of lawsuits alleging price-fixing in the generic drug industry; that

the federal cases had been combined in a multi-district litigation in the Eastern District of

Pennsylvania; that it had made a provision of $200 million for the "ongoing multi-jurisdiction

civil antitrust matters"; and that that figure had been reduced by almost $60 million as a result of

a settlement with some of the plaintiffs.  (ECF No. 40-2 at 71.)[3]  As the Proxy Statement

explained, the valuation of this contingency was the subject of intense negotiation between the

parties.  (Proxy Statement at 21-26.)  Taro's Board had approved an estimate of $141 million,

which had been calculated based on settlement offers Taro had previously made to plaintiffs, and

the Special Committee directed BofA to use this $141 million figure in its financial analysis.  (*Id.*

at 21, 24.)  Sun took issue with the Board-approved contingency estimate, pointing out that all of

the settlement offers on which the estimate was based had been rejected and arguing that it

would thus necessarily cost more to resolve the Pending Litigation.  (*Id.* at 23-24.)  While

recognizing that it might reflect an optimistic assumption, the Special Committee nonetheless

insisted on using the amount approved by the Board, concluding that there was no sound basis to

support any other estimate, given the inherent uncertainty involved in evaluating the cost of

future litigation.  (*Id.* at 24-26.)  Additionally, the Proxy explained, the Special Committee asked

BofA to prepare a sensitivity analysis that reflected a doubling of the Board-approved Litigation

Loss Contingency Amount, for reference only and not as part of the financial analysis.  (*Id.* at

22.)

---

[3] The balance sheet in the annual report showed, under "Current Liabilities," a little over $140 million for "Settlement and loss contingencies."  (ECF No. 40-2 at F-8.)  I may take judicial notice of the contents of the annual report because it was filed with the SEC.  *See Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, No. 14-CV-9443, 2016 WL 2859622, at *8 (S.D.N.Y. May 16, 2016) ("[T]he Court may take judicial notice of public disclosure documents that must be filed with the SEC . . . .").  (Unless otherwise indicated, case quotations omit internal quotation marks, citations, alterations and footnotes.)

In addition to the ongoing civil antitrust matters, Taro was also in the process of litigating a securities class action predicated on the failure to disclose alleged price collusion in violation of the antitrust laws.  (AC ¶¶ 9, 65-71.)  *See* Complaint, Speakes v. Taro, No. 16-CV-8318 (S.D.N.Y. Oct. 25, 2016), ECF No. 1.[4]  After reaching an agreement in principle on September 26, 2023 to settle the case for $36 million, Taro and the *Speakes* plaintiffs filed a stipulation and agreement of settlement on April 15, 2024, the same day Taro filed the Proxy Statement.  (AC ¶¶ 65, 71.)  *See* Stipulation and Exhibits, Speakes v. Taro, No. 16-CV-8318 (S.D.N.Y. Apr. 15, 2024), ECF No. 101-1.[5]

On May 8, 2024, Taro amended its Schedule 13E-3 filing to inform shareholders "that leading independent proxy advisory firms Institutional Shareholder Services (ISS) and Glass Lewis & Co. ('Glass Lewis') ha[d] both recommended that Taro shareholders vote '**FOR**' the pending Merger transaction."  (AC ¶ 77.)  The filing did not summarize or include any additional information about the reports, nor did Taro provide the reports to shareholders.  (*Id.* ¶¶ 78-80; *see also* ECF No. 40-6.)

On May 23, 2024, Taro announced that its shareholders had approved the merger, and the transaction closed on June 24, 2024.  (AC ¶¶ 82-83.)  Certain minority shareholders asked Taro to publicize the vote count in order to confirm that it had satisfied the majority of the minority

---

[4] "Courts may take judicial notice of public documents or matters of public record[,] including the contents of court dockets."  *Fecteau v. City of Mount Vernon*, No. 23-CV-09173, 2025 WL 754043, at *7 (S.D.N.Y. Mar. 10, 2025), *reconsideration denied*, 2025 WL 1196039 (S.D.N.Y. Apr. 22, 2025).

[5] The court granted preliminary approval of the settlement on May 8, 2024, *see* Order Granting Preliminary Approval of Class Action Settlement, Speakes v. Taro, No. 16-CV-8318 (S.D.N.Y. May 8, 2024), ECF No. 105, and entered the final order approving the settlement on August 23, 2024, *see* Final Order and Judgment, Speakes v. Taro, No. 16-CV-8318 (S.D.N.Y. Aug. 23, 2024), ECF No. 115.

requirement, but the company had not yet done so at the time of the filing of the AC.  (*Id.* ¶¶ 83-85.)

### B.    Procedural History

On September 9, 2024, Plaintiff filed his initial Complaint.  (ECF No. 1.)  On October 23, 2024, Plaintiff and the Defendants who filed the instant motion filed a letter with the Court stipulating that those Defendants would agree to waive service of the initial complaint and that the parties would confer and file a proposed schedule for an amended complaint within fourteen days after a lead plaintiff had been appointed pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").  (ECF No. 29.)  The Court approved the stipulation the following day.  (ECF No. 30.)

Plaintiff filed a motion to be appointed as lead plaintiff, with his attorneys as co-lead counsel, on November 12, 2024.  (ECF No. 31.)  No other plaintiff applied to serve as lead counsel, and on December 2, 2024, the Court granted Plaintiff's motion.  (ECF No. 34.)

On December 16, 2024, the parties filed another letter stipulating that:  (1) Plaintiff would file an amended complaint or designate his initial complaint as the operative complaint within sixty days after the Court's approval of the stipulation; (2) Defendants would file an answer or motion to dismiss within sixty days after the filing of an amended complaint; and (3) if Defendants sought to move to dismiss, they would not need to file a pre-motion letter or seek a pre-motion conference as otherwise required by the Court's rules.  (ECF No. 35.)  The parties also stipulated to a briefing schedule for the motion to dismiss.  (*Id.*)  The Court approved the stipulation the next day with the following qualification:  if Defendants moved to dismiss, Plaintiff would have another opportunity to amend his pleading, and if he declined to do so at

that time, the Court would be unlikely to grant another opportunity to amend to address the issues raised by the motion.  (ECF No. 36.)

Plaintiff filed the AC on February 17, 2025, and the instant motion followed.  On April 28, 2025, Plaintiff notified the Court that he would rely on the AC rather than file another amended pleading.  (ECF No. 41.)

## II.    LEGAL STANDARD

### A.    Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* at 679.

Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

### B.    Pleading Standard Under the PSLRA

In addition to the *Twombly-Iqbal* standard, private securities law claims based on allegedly misleading statements or omissions are subject to a heightened pleading standard under the PSLRA. *See* 15 U.S.C. § 78u-4(b). Where a plaintiff asserts such claims, the complaint must "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(1)). The PSLRA's pleading standards as to misleading statements and omissions apply both to claims alleging fraud and those sounding in negligence. *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 529 (S.D.N.Y. 2021) (collecting cases), *judgment entered*, No. 19-CV-3356, 2021 WL 5140777 (S.D.N.Y. Nov. 4, 2021); *Furlong Fund LLC v. VBI Vaccines, Inc.*, No. 14-CV-9435, 2016 WL 1181710, at *3 (S.D.N.Y. Mar. 25, 2016).

### C.    Documents Considered

"Documents outside of the pleadings are not generally considered in the context of a motion to dismiss." *Noel v. Wal-Mart Stores, E. LP*, 764 F. App'x 17, 19 (2d Cir. 2019) (summary order). But, in addition to considering the facts alleged in the complaint, a district court may consider

> documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint. For a document to be considered integral to the complaint, the plaintiff must rely on the terms and effect of a document in drafting the complaint[;] mere notice or possession is not enough. And even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document, and it must be clear that there exist no material disputed issues of fact regarding the relevance of the document.

*United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021); *see Solano v. New York*, No. 20-CV-1378, 2021 WL 4134793, at *3 (N.D.N.Y. Sept. 10, 2021); *170 Mercer LLC v. Rialto Cap. Advisors, LLC*, No. 20-CV-2496, 2021 WL 1163649, at *2 (S.D.N.Y. Mar. 25, 2021). The Court may therefore consider Taro's April 15, 2024 Proxy Statement because it is incorporated by reference in and integral to the AC.

## III.    **DISCUSSION**

As a threshold matter, Defendants contend that Section 13(e) of the Securities Exchange Act of 1934, on which Plaintiff bases his claims, does not provide a private right of action.[6] Section 13(e) and the rules promulgated thereunder subject companies who seek to engage in a "going private" transaction to heightened disclosure requirements and forbid them from making "any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.13e-3; *see* 15 U.S.C. § 78m(e). "As courts in this district have previously recognized, whether Section 13(e) authorizes private suits remains an unsettled issue." *Lu v. Cheer Holding, Inc.*, No. 24-CV-459, 2025 WL 2371153, at *6 (S.D.N.Y. Aug. 14, 2025) (collecting cases); *see Boylan v. Sogou Inc.*, No. 21-CV-2041, 2021 WL 4198254, at *10

---

[6] While the AC asserts claims under both Section 14(a) and Section 13(e), Plaintiff abandoned his 14(a) claims in his opposition. (ECF No. 42 ("P's Opp.") at 1 n.1.)

(S.D.N.Y. Sept. 13, 2021) ("Many courts – including a sister court in this District – have refused to recognize an implied right of action under Section 13(e) of the Exchange Act."). The Court need not decide this question, however, because, for the reasons stated below, Plaintiff has failed to allege any actionable material misstatement or omission.[7]

### A.    Claims Regarding BofA's Role in the Transaction

Plaintiff first claims that the Proxy Statement omitted material information by failing to specify whether BofA "recommended the amount of consideration to be paid" in the transaction. (*See* AC ¶ 40.) In support of his argument, Plaintiff points to Item 1015(b) of Regulation M-A, 17 C.F.R. § 229.1015, which delineates what information proxy solicitations in merger transactions must include with regard to financial reports. (AC ¶¶ 35-39.) Pursuant to that provision, where a "report, opinion or appraisal relates to the fairness of the consideration," the proxy solicitation must "state whether the subject company or affiliate determined the amount of consideration to be paid or whether the outside party recommended the amount of consideration to be paid." 17 C.F.R. § 229.1015(b)(5).

The Proxy Statement, however, complied with this requirement. In its discussion of the BofA analyses, the Proxy Statement explicitly states that "[t]he type and amount of consideration payable in the merger was determined through negotiations between the Special Committee and Sun Pharma, rather than by any financial advisor, and was approved by the Special Committee, the Audit Committee and the Board." (Proxy Statement at 47.) It thus makes clear, as required,

---

[7] Because Plaintiff has failed to allege a material misstatement or omission, it is also unnecessary to address the parties' disagreement as to what level of scienter would be required to state a claim under Section 13(e) assuming the statute provides a private cause of action, as well as whether and to what extent Plaintiff would be required to allege loss causation. (*See* ECF No. 39 ("Ds' Mem.") at 25-28; P's Opp. at 24-27.)

that "the amount of consideration to be paid" was "determined" by the company, not "recommended" by BofA.

Plaintiff attempts to create ambiguity in this statement by insisting that it does not foreclose the possibility that BofA recommended the amount of consideration to be paid, hypothesizing that "while the negotiations between Taro's Special Committee and Sun Pharma ultimately ***determined*** the amount of consideration, BofA Securities may have ***recommended*** to Taro's Special Committee a 'target' price that they should attempt to obtain through its negotiations." (AC ¶ 41 (emphases in original); *see* P's Opp. at 15-16.) In other words, Plaintiff contends that it could be true both that the Special Committee and Sun determined the amount of consideration and that BofA recommended it. Plaintiff argues that if BofA had "provided a 'target' floor price for the Special Committee to negotiate in order to obtain a fairness opinion," "that would undoubtedly be material because it would suggest that the Special Committee was not actually seeking the best price available and was instead happy to acquiesce to a price that BofA Securities had already advised them would be 'fair.'" (P's Opp. at 15-16.)

But Plaintiff provides no factual allegations suggesting that he has any grounds for believing that BofA provided such a "target" price, and he cannot "substitute indirect, hypothetical allegations for more directly applicable factual allegations, particularly in light of the pleading requirements under . . . the PSLRA." *Ellington Mgmt. Grp., LLC v. Ameriquest Mortg. Co.*, No. 09-CV-416, 2009 WL 3170102, at *3 (S.D.N.Y. Sept. 29, 2009). Section 13(e) does not require a proxy statement to rule out every scenario an imaginative mind might conjure. The Proxy Statement provides a clear and detailed description of BofA's role in creating its financial opinion and presenting it to the Special Committee, and it expressly stated that the merger consideration was determined by negotiation between the Special Committee and Sun

12

Pharma rather than by BofA.  Moreover, the Proxy made clear that BofA's only opinion was that the consideration to be paid to the shareholders was fair, (Proxy Statement Appendix B at 3), and that BofA had "expressed no opinion or view as to any terms or other aspects or implications of the merger (other than the merger consideration to the extent expressly specified in such opinion)," (Proxy Statement at 13, 38.)  Plaintiff's strained interpretation of the Proxy Statement as leaving open the possibility that BofA had some greater, undisclosed role in determining the merger consideration does not state a plausible omission claim, and certainly not with the particularity required under the PSLRA.

### B.    Claims Regarding BofA's Calculations

Plaintiff next alleges that the Proxy Statement misstated or inadequately disclosed the "methodology, assumptions, and procedures" BofA used in conducting its financial analyses, particularly with regard to how BofA incorporated the $141 million Litigation Loss Contingency.  (AC ¶¶ 42-61.)  In its summary of BofA's discounted cash flow analysis, the Proxy Statement explains that BofA calculated a range of Taro's aggregate enterprise value, then added Taro's net cash – which it had calculated as $1.295 billion – to that range, and then divided the total by the number of Taro's fully diluted shares to obtain the approximate implied equity value reference ranges per share.  (Id. ¶¶ 44-45; Proxy Statement at 42.)[8]  But BofA's full presentation to the Special Committee, which was filed as an exhibit to the Schedule 13E-3, demonstrates that BofA had actually subtracted the $141 million Litigation Loss Contingency Amount from the net cash amount before dividing the total by the number of shares to determine the per-share value.  (AC ¶¶ 46-50.)  According to Plaintiff, because BofA actually added

---

[8] Plaintiff also alleges that BofA performed a similar calculation in its "comparable companies multiples analysis," thus rendering that analysis misleading as well.  (AC ¶¶ 51-55; P's Opp. at 18.)

approximately $1.155 billion, not $1.295 billion as set forth in the Proxy Statement summary, that summary misled shareholders into thinking that the $141 million liability had not been taken into account by BofA in its valuation of the share price.  (*See* P's Opp. at 17-18.)  Although Plaintiff does not explain further, his argument appears to be that a shareholder might have inferred that once that liability was taken into account, the share value would be lower, and a shareholder believing that BofA's valuation was too high (because it did not account for the $141 million) might regard Sun's offer as more attractive than it actually was.

The Proxy Statement summary also described BofA's sensitivity analysis, which analyzed the impact of an "Incremental $141M" and concluded that it would reduce the reference range per share by $3.75.  (AC ¶ 56.)  It is clear from the full presentation that the sensitivity analysis was not a calculation of how the $141 million Litigation Loss Contingency Amount itself would impact share value, but rather how a doubling of this $141 million would change the analysis.  (*Id.* ¶¶ 57-58.)  According to Plaintiff, however, the Proxy Statement summary again misled investors into believing that BofA's valuation analysis had not already accounted for the Litigation Loss Contingency Amount, and that that amount was only reflected as the "Incremental $141M" that reduced the value ranges in the sensitivity analysis.  (*See* P's Opp. at 18-19.)

Standing alone, the portion of the Proxy Statement that Plaintiff highlights could be characterized as misleading.  The Proxy Statement states that "the net cash of the Company of $1,295 million as of September 30, 2023" was added to the range of implied enterprise values, (Proxy Statement at 42), and Plaintiff does not dispute that the net cash of Taro as of that date was that amount.  While this statement is thus literally true, it fails to mention BofA reduced this net cash balance by the "settlement and loss contingencies as of June 30, 2023" before estimating

the value per share, as demonstrated by the full presentation.  (ECF No. 40-3 at 9.)  In assessing

whether a statement is misleading, "literal accuracy is not enough:  An issuer must as well desist

from misleading investors by saying one thing and holding back another."  *Omnicare, Inc. v.*

*Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015)).  Thus, even if

Defendants' statement about adding $1.295 billion was technically true, investors reading only

the Proxy Statement's summary of BofA's discounted cash flow analysis may not have realized

that the estimated share values accounted for the Litigation Loss Contingency Amount by

subtracting $141 million.  And the "Incremental $141M" calculated for the "Litigation Accrual"

in the sensitivity analysis, (Proxy Statement at 43), may accordingly have appeared to be the

only calculation that assessed the impact of the pending litigation.

But "[t]he test for whether a statement or omission is materially misleading is not

whether the statement is misleading in and of itself, but whether the defendants' representations,

taken together and in context, would have misled a reasonable investor."  *Gluck v. Hecla Mining*

*Co.*, No. 19-CV-4883, 2024 WL 4362730, at *5 (S.D.N.Y. Sept. 30, 2024), *aff'd*, No. 24-2947-

CV, 2025 WL 1983204 (2d Cir. July 17, 2025); *see Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161,

176 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).  Reading the BofA summary in the

context of the Proxy Statement as a whole, no reasonable investor could understand the Proxy

Statement to suggest that the estimated share values did not account for the Litigation Loss

Contingency Amount.  *See Gluck*, 2024 WL 4362730, at *5 (representations must be taken

"together and in context"); *see also In re Vroom, Inc. Sec. Litig.*, No. 21-CV-2477, 2025 WL

862125, at *12 (S.D.N.Y. Mar. 18, 2025) ("A statement is misleading if a reasonable investor, in

the exercise of due care, would have received a false impression from the statement.").  The fact

that BofA included the Litigation Loss Contingency in its valuation, and doubled the

contingency amount for the sensitivity analysis, was repeatedly disclosed in the "Background to the Merger" section before the reader would even reach the summary of the BofA opinion. (*See* Proxy Statement at 22 ("The Special Committee . . . decided that it would direct BofA Securities to use the Board-approved Litigation Loss Contingency Amount for purposes of its financial analysis of Taro . . . ."); *id.* ("The Special Committee also requested BofA Securities to prepare . . . a separate sensitivity analysis for review by the Special Committee utilizing the Long-term Financial Model but adjusted to reflect . . . a Litigation Loss Contingency Amount based on a doubling of the Board-approved Litigation Loss Contingency Amount."); *id.* at 26 (price of $43 per share was favorable because "BofA Securities' preliminary financial analysis . . . was based on the Long-term Financial Model, which contained several assumptions, certain of which the Special Committee believed to be optimistic, including . . . the Board-approved Litigation Loss Contingency Amount.").) The summary also described in detail the impact of the dispute over the loss contingency calculation on the parties' negotiations. (*Id.* at 21-26.) Further, the portion of the Proxy Statement describing the Long-term Financial Model explicitly discloses that the model assumes "a debt-like item relating to the Board-approved Litigation Loss Contingency Amount for the Pending Litigation that Taro could incur, equal to the amount accrued on to Taro's balance sheet for fiscal year ending March 31, 2023 of approximately $141 million." (*Id.* at 60.)

Thus, the Proxy Statement makes clear that the Litigation Loss Contingency Amount was factored into the valuation, and, at most, fails to explain how exactly BofA accounted for it. But "[c]ourts within this Circuit routinely find that the omission of underlying inputs, assumptions, and financial metrics for the aforementioned types of analyses and opinions, or omission of alternate projections, do not render proxies misleading when there is a fair summary of the

underlying bases for the analyses or opinions." *Bisel v. Acasti Pharma, Inc.*, No. 21-CV-6051, 2022 WL 4538173, at *10 (S.D.N.Y. Sept. 28, 2022) (collecting cases); *see Reinhardt v. Cortland Bancorp Inc.*, No. 21-CV-8460, 2021 WL 5013800, at *2 (S.D.N.Y. Oct. 28, 2021). Thus, that the summary did not explicitly detail how the Litigation Loss Contingency Amount was taken into account in the calculation does not itself render the Proxy Statement misleading, and would not provide a reasonable shareholder – knowing he was only receiving a summary, not a full description of the inputs into the calculation – with a basis to infer from the absence of that detail that the contingency had not been taken into account. Plaintiff was entitled only to a fair summary, not "to disclosures sufficient to make [his] own independent assessment" of the value of his shares. *Reinhardt*, 2021 WL 5013800, at *2; *see Sodhi v. Gentium S.p.A.*, No. 14-CV-287, 2015 WL 273724, at *5 (S.D.N.Y. Jan. 22, 2015).

Moreover, as Defendants point out, Taro *did* provide sufficient information for Plaintiff to conduct his own independent assessment, even though it was not required to do so. (Ds' Mem. at 16-17.) In detailing how BofA in fact accounted for the Litigation Loss Contingency, Plaintiff relies on documents that were attached as exhibits to the Schedule 13E-3. This demonstrates that this information was available to shareholders from the outset, not omitted in an attempt to mislead them. *See Bisel*, 2022 WL 4538173, at *13 ("There can be no omission where the allegedly omitted facts are disclosed."); *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 464 (S.D.N.Y. 2010) ("[T]his omission is not actionable because the financial reports attached to the relevant Proxies contain adequate disclosures to this effect.").

Plaintiff attempts to avoid this conclusion by insisting that "Taro's public stockholders are not expected to comb through the exhibits to the Schedule 13E-3 to validate information that the Proxy purported to clearly disclose." (AC ¶ 60.) But while "[a] reasonable stockholder is

17

not required to validate each disclosure," *City of Warren Gen. Emps.' Ret. Sys. v. Roche*, No. 19-CV-740, 2020 WL 7023896, at *23 (Del. Ch. Nov. 30, 2020), and information that clarifies otherwise misleading statements may not suffice "if the true is buried in unrelated discussions," *United Paperworkers Int'l Union v. Int'l Paper Co.* 985 F.2d 1190, 1200 (2d Cir. 1993) (environmental information buried in annual report where it "was placed in an untitled financial summary section"), the Proxy Statement itself repeatedly makes clear that the Litigation Loss Contingency Amount was accounted for in BofA's analysis, as discussed above.  And while the Proxy Statement's summary may not have spelled out exactly how the contingency was factored into the analysis, the calculations underlying BofA's valuation were explained in more detail in its full financial presentation – exactly where one would expect to find such information.  It cannot be said that Defendants "buried" this information, especially considering that the Proxy Statement expressly highlighted, immediately after the summary of BofA's work, that BofA considered additional inputs and analyses in rendering its opinion.  (*See* Proxy Statement at 46 (summary "is not a comprehensive description of all analyses[] undertaken or factors considered by BofA Securities in connection with its opinion").)  "This language is sufficient to put a reasonable investor on notice that the [summary] does not represent a complete description of all analyses performed and, therefore, makes it not misleading to omit any analysis that [BofA] may or may not have conducted."  *Sodhi*, 2015 WL 273724, at *6; *see Bisel*, 2022 WL 4538173, at *12 ("omission of specific risk adjustments [does] not render statement misleading where statement explicitly notes that it is *not* a comprehensive discussion of everything the advisor did and that it is not a complete description of all analyses performed and factors considered by the advisor in connection with its opinion") (emphasis in original).

In short, it is all but inconceivable that a shareholder could have thought that BofA had not accounted for the $141 million Litigation Loss Contingency Amount.  While the portion of the Proxy Statement emphasized by Plaintiff may not have detailed exactly *how* that contingency was incorporated, a reasonable investor, reading the BofA summary in the context of the rest of the Proxy Statement – let alone the exhibits filed with the Schedule 13E-3 – would have understood that the Litigation Loss Contingency had been factored into the valuation.  As such, Plaintiff has not alleged an actionable misstatement or omission with regard to BofA's calculations. [9]

C.    **Claims Regarding the *Speakes* Litigation**

Plaintiff also takes issue with the Proxy Statement's discussion of the negotiations regarding the Litigation Loss Contingency, which explained that Sun believed the Board-approved amount to be too low because it was drawn from prior settlement offers that Taro had made, "all of which had been rejected."  (Proxy Statement at 24; AC ¶¶ 63-65.)  According to Plaintiff, the fact (unmentioned in the Proxy Statement) that the plaintiffs in the *Speakes*

_____

[9] Moreover, even if the literally true statement should have been that BofA added $1.155 billion, because the amount added was the net cash amount that had already been reduced, and thus the $1.295 billion figure was never actually "added," it is hard to see why any such misstatement would be material.  To the extent that shareholders may have been misled about the stage of the valuation at which the $141 million was subtracted, it is not plausible that any resulting misconception would be significant to a reasonable investor in making investment decisions.  *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017) ("[A] misrepresentation or omission is material when a reasonable investor would attach importance to it in making an investment decision.").  Apart from Plaintiff's theory that a shareholder might think the contingency had not been accounted for – a theory I have already rejected – the difference between "BofA added $1.155 billion" is not significantly different from "BofA added $1.295 billion and then subtracted $141 million."

litigation had accepted a settlement offer rendered this statement misleading.  (AC ¶¶ 9, 62-71.)[10]

The first problem with this argument is that the Proxy Statement specifically stated that the Litigation Loss Contingency Amount was "related to Taro's ongoing multi-jurisdiction civil antitrust matters," (Proxy Statement at 21), and, as Plaintiff concedes, the *Speakes* litigation was *not* an antitrust matter – it was a securities class action, (AC ¶ 68).  Nor was it part of any multi-jurisdiction litigation; it was a standalone case in this Court.  While Plaintiff insists that the *Speakes* litigation was relevant to the calculation because its securities fraud claims were based on alleged non-disclosure of antitrust violations, and the "Litigation Loss Contingency was to resolve litigation 'related to ongoing multi-jurisdiction civil antitrust matters,'" (*id.*), that is a distortion.  The BofA presentation on which Plaintiff relies, (*id.*), and which uses the phrase "related to ongoing multi-jurisdiction civil antitrust matters," (ECF No. 40-5 at 4-5), states that the *contingency itself* was "related to" ongoing multi-jurisdiction civil antitrust matters, not that the contingency was to *resolve all litigation* "related to" civil antitrust matters.  *See TufAmerica, Inc. v. Diamond,* 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."); *Matusovsky v. Merrill Lynch,*

---

[10] Sun's position – that the contingency was too low – would, if accepted, mean that BofA's valuation of the stock was too high.  This dispute was fully aired in the Proxy Statement and Plaintiff does not suggest otherwise.  He does not spell out how the *Speakes* settlement would factor into a shareholder's evaluation of Sun's offer, but he may mean to contend that the $36 million *Speakes* settlement should have been subtracted from the $141 million contingency, and that by subtracting $141 million instead of $105 million, BofA undervalued Taro shares.  He also seems to suggest that the *Speakes* settlement negated Sun's argument that all settlement offers had been rejected.  (*See* P's Opp. at 21-22.)  Both theories depend on *Speakes* being one of the cases for which the Litigation Loss Contingency Amount was set aside, which, as discussed below, is not plausible.

186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (court may consider "documents that are integral to, or explicitly referenced in, the pleading," and "[i]f a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss.").  Moreover, the previous page of that same presentation described Taro's "provision of $140mm as of 31-Mar-23" for "Multi-Jurisdiction Settlement" under the heading "Generic Drug Price Fixing Litigation Summary."  (ECF No. 40-5 at 3.)  No reasonable viewer of the presentation could have understood the contingency to include provision for settling the *Speakes* securities fraud case.  Plaintiff cannot argue that the Proxy Statement was misleading by quoting its language out of context.  *See Gluck*, 2024 WL 4362730, at *5 (defendant's representations must be "taken together and in context").

Moreover, the portion of the Proxy Statement with which Plaintiff takes issue merely sets forth Sun's argument for increasing the amount of the Litigation Loss Contingency.  (*See* Proxy Statement at 24 ("A Sun Pharma representative stated that the Board-approved Litigation Loss Contingency Amount was derived from an accounting calculation that involved aggregating, and extrapolating from, the settlement offers that Taro had made to plaintiffs, all of which had been rejected . . . .").)  Plaintiff does not contend that Sun's position was not set forth accurately. Even assuming that Taro should have included provision for the *Speakes* settlement in the Litigation Loss Contingency, it was not misleading for the Proxy Statement to truthfully recount what Sun had argued during the parties' negotiations.  Plaintiff's issue, therefore, appears to be with Defendants' valuation of the Litigation Loss Contingency, not with the way it is described in the Proxy Statement.  Disagreements as to valuation methods, however, are insufficient to support a securities fraud claim.  *See Point12 Diversified Fund, LP v. TMC The Metals Co.*, No.

21-CV-5991, 2025 WL 1920340, at *18 (E.D.N.Y. July 11, 2025); *In re Allied Cap. Corp. Sec. Litig.*, No. 02-CV-3812, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003).

Finally, as the AC points out, "the *Speakes* settlement was finalized at least as early as April 10, 2024, and filed along with the motion for court approval in the Speakes action on or about April 15, 2024, more than a month before the Shareholder Vote." (AC ¶ 71.) While Plaintiff relies on this statement to argue that the lack of a definitive settlement was not "grounds to conceal the *Speakes* Settlement," (*id.*), the public filing of the settlement actually demonstrates that it was not "concealed" at all. Rather, the fact that Taro had stipulated to a settlement in the *Speakes* litigation was public knowledge readily available to shareholders. Because "defendant[s] cannot be held liable for failing to disclose information that is in fact readily accessible in the public domain," *Dagan Invs., LLC v. First High-Sch. Educ. Grp. Co.*, No. 22-CV-3831, 2023 WL 8452223, at *5 (S.D.N.Y. Dec. 6, 2023), the absence of a disclosure as to the *Speakes* settlement cannot constitute a material omission.

### D.    Claims Regarding the Glass Lewis and ISS Reports

Finally, Plaintiff claims that Defendants violated Item 1015 by disclosing Glass Lewis's and ISS's recommendations in favor of the transaction without including the full reports or specifying whether Taro paid for these reports. (AC ¶¶ 72-80.) The relevant regulation governs what information must be disclosed when "the subject company or affiliate has received any report, opinion (other than an opinion of counsel) or appraisal from an outside party that is materially related to the Rule 13e-3 transaction," including "the method of selection of the outside party" and the relationship between the outside party and the subject company. 17 C.F.R. § 229.1015. Thus, where an issuer procures a fairness opinion from a financial advisor, such as the BofA report, the issuer must disclose the information required by Item 1015. *See*

*Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 248 n.41 (S.D.N.Y. 2000) (Item

1015 "states that if a fairness opinion is obtained, it must be made available [to shareholders] for

inspection and copying"); *see also In re Almost Fam. Inc. Sec. Litig.*, 572 F. Supp. 3d 346, 354

(W.D. Ky. 2020) (Item 1015 "requir[es] companies that receive fairness opinions to disclose

summaries of those opinions, including the the [*sic*] bases for and methods of arriving at such

findings and recommendations"); *Goldfinger v. J. Commc'ns Inc.*, No. 15-C-12, 2015 WL

2189752, at *4 (E.D. Wis. May 8, 2015) ("SEC regulations require disclosure of all material

relationships between a company and its financial advisor and the compensation received by the

advisor for the last two years . . . .").

      The opinions of Glass Lewis and ISS, however, were merely the recommendations of

independent proxy advisory firms; they were not selected by or prepared for Taro, nor did they

play any role in the negotiation of the transaction.  Plaintiff provides no authority for the

proposition that Item 1015 disclosures are required where the entity rendering the opinion has no

relationship with the company that is proposing to merge.  That the regulation is meant to apply

only to recommendations procured by the company is reinforced by the fact that some of the

information required to be disclosed – for example, the "method of selection of the outside

party" or "instructions received from the subject company or affiliate; and any limitation

imposed by the subject company or affiliate on the scope of the investigation," 17 C.F.R. §

229.1015(b)(3), (6) – makes no sense when the outside party is independent of the company.

 Plaintiff's claim concerning the independent proxy advisor reports is therefore dismissed.[11]

---

[11] Plaintiff also takes issue with Defendants' failure to disclose the results of the
shareholder vote.  (AC ¶¶ 81-85; P's Opp. at 24.)  It is unclear how this purported failure relates
to Plaintiff's claims.  While Plaintiff argues that it "raises an inference that the shareholder vote
was close, so that a nondisclosure or misleading disclosure that may have affected few votes
would have been material to the outcome of the vote," (P's Opp. at 24), the standard for

E.    **Section 20(a) Claims**

Finally, Plaintiff's Section 20(a) claims asserting control person liability against the

Individual Defendants also fail.  "To establish a prima facie case of control-person liability, a

plaintiff must successfully allege a primary violation."  *Tung v. Bristol-Myers Squibb Co.*, 412 F.

Supp. 3d 453, 462 (S.D.N.Y. 2019); *see In re Canopy Growth Sec. Litig.*, No. 23-CV-4302, 2024

WL 3445436, at *16 (S.D.N.Y. July 17, 2024), *appeal withdrawn*, No. 24-2121, 2024 WL

4763225 (2d Cir. Oct. 9, 2024).  Plaintiff's failure to adequately alleged any primary violation

thus necessitates dismissal of his 20(a) claims as well.

IV.    **LEAVE TO AMEND**

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R.

Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to

amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018).  "Leave to amend, though liberally

granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments

previously allowed'" or "'futility of amendment,'" among other reasons.  *Ruotolo v. City of N.Y.*,

514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended his complaint, after having waived the opportunity for a

pre-motion conference.  (ECF Nos. 35-36.)  Further, Plaintiff had another opportunity to amend

after Defendants moved to dismiss and declined to do so, despite prior notification by the Court

---

determining whether a statement or omission is material, as discussed above, is whether "a
reasonable investor would have considered it significant in making investment decisions,"
*Altayyar*, 242 F. Supp. 3d at 172; *see In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d at
610.  Thus, even if the Court were to accept Plaintiff's assumption that the vote was close, that
does not support his blanket argument that this renders any misleading statement material or
otherwise relieves him of his obligation to explain the significance of each alleged misstatement
or omission.  And to the extent that Plaintiff relies on this assumption to support his theory of
loss causation, this argument is irrelevant due to his failure to plead a material misstatement or
omission.

that further opportunities to amend to address the issues raised by the motion would be unlikely

once the motion had been decided.  (ECF Nos. 36, 41.)  In general, a plaintiff's failure to fix

deficiencies in the previous pleading, after being provided notice of them, is alone sufficient

ground to deny leave to amend.  *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*,

898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his

complaint when he first amended, he clearly has no right to a second amendment even if the

proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy

district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.");

*Williams v. Time Warner Inc.*, No. 09-CV-2962, 2010 WL 846970, at *7-8 (S.D.N.Y. Mar. 3,

2010) (leave to amend properly denied where plaintiff declines to amend after being advised of

arguments for dismissal and complaint's deficiencies), *aff'd*, 440 F. App'x 7 (2d Cir. 2011); *In re

Eaton Vance Mut. Funds Fee Litig*., 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to

amend because "the plaintiffs have had two opportunities to cure the defects in their complaints,

including a procedure through which the plaintiffs were provided notice of defects in the

Consolidated Amended Complaint by the defendants and given a chance to amend their

Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended

complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance

Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an

advisory opinion from the Court informing them of the deficiencies in the complaint and then an

opportunity to cure those deficiencies).

Moreover, Plaintiff has not asked to amend again or otherwise suggested that he is in

possession of facts that would cure the deficiencies identified in this decision.  *See

TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be

given leave to amend if [he] fails to specify . . . how amendment would cure the pleading deficiencies in [the] complaint."); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice "in the absence of any indication that [plaintiff] could—or would—provide additional allegations that might lead to a different result . . . ."); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend); *GateGuard, Inc. v. Amazon.com Inc.*, No. 21-CV-9321, 2023 WL 2051739, at *21 (S.D.N.Y. Feb. 16, 2023) (denying leave to amend where plaintiff "already amended its complaint in response to [Defendant's] pre-motion letter detailing the bases for its anticipated motion to dismiss" and did not seek leave to amend again).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

## V.    **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 38), and close the case.

**SO ORDERED.**

Dated:  October 27, 2025
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.